Filed 8/30/23  In re J.B. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re J.B. et al., <br><br> Persons Coming Under the Juvenile Court Law. | B323563 <br><br> (Los Angeles County Super. Ct. No. 22CCJP02444) |

LOS ANGELES COUNTY
DEPARTMENT OF CHILDREN
AND FAMILY SERVICES,

      Plaintiff and Respondent,

      v.

JOSE R.,

      Defendant and Appellant;

SANDRA B.,

      Defendant and Respondent.

APPEAL from orders of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge. Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant Jose R.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Respondent Sandra B.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant Jose R. (Father) challenges the juvenile court's assertion of jurisdiction over his children J.B., M.B., and A.M. under Welfare and Institutions Code[1] section 300, the court's dispositional orders, and the court's issuance of a restraining order protecting Sandra B. (Mother) and the children from Father. The court assumed jurisdiction over the children, and issued its removal order, based on Father's perpetration of domestic violence against Mother, Father's abuse of M.B., and Father's substance abuse. We find that substantial evidence supports the juvenile court's jurisdictional order and that Father's arguments against the disposition orders lack merit. Thus, we affirm those orders. Father's notice of appeal did not encompass the restraining order, and Father has failed to provide us with an adequate record to review the order. We therefore dismiss Father's appeal of the restraining order.

_____

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND

## A. The Family

Mother and Father were married in 2012 and they lived with their two children, M.B. (born in 2015) and A.M. (born in 2020), and Mother's older child J.B. (born in 2005). Maternal grandmother, along with a maternal aunt and her children, also lived in the home.

## B. DCFS Investigation

On May 26, 2022, respondent Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging that Mother was leaving the house with A.M. but Father did not want them to leave. Mother got into her car with A.M. and Father climbed onto the hood, smashed the windshield, and tried to pry it loose. According to the reporting party, Mother called 911 to have Father arrested.

On June 3, 2022, a social worker went to the house where she interviewed Father, Mother, maternal grandmother, the maternal aunt, J.B., and M.B.

Mother confirmed the report regarding the May 26, 2022 incident. According to Mother, she and A.M. were getting ready to leave the home, and Father did not want them to leave. Mother got in the car with A.M., and Father then slashed the tires. A.M. was on Mother's lap, and Mother feared the child would be hurt, which prompted her to call 911. While she was speaking with the 911 operator, Father repeatedly punched the windshield and was eventually able to break it. When police officers arrived, they arrested Father.

Father admitted to breaking the car windshield. He stated that he and Mother had been arguing and he did not want Mother to leave the home. He at first claimed that none of the

children was present during the incident, but in another interview several days later he acknowledged that A.M. was in the car.

Mother, maternal grandmother, and the maternal aunt all suspected that Father was abusing drugs. He would stay in the garage for long periods of time. He did not allow Mother to go into the garage, but once Mother did go inside and found crystal methamphetamine and pipes for smoking the drug. Mother believed that Father had supplied the eldest minor J.B. with marijuana. Mother, the maternal aunt, maternal grandmother, and the children would stay out of the home for long periods of time to avoid Father. Maternal grandmother took care of A.M. while Mother worked but did so outside of the family home to avoid contact with Father.

During the social worker's first visit, Father denied using any drugs other than marijuana, refused to submit to drug testing, and refused to grant the social worker access to the garage. However, during a further interview about two weeks later, Father admitted that he had been using methamphetamine for about six months, and had more recently started using crack cocaine and "drinking [alcohol] to excess to cope" with stress.

Mother, Father, and the maternal aunt had bought the house a year earlier; Mother and the maternal aunt wanted to sell the house, but Father did not. This was causing strife. Father was not working, but Mother was. According to Mother, Father was supposed to make improvements to the house and he had made some, but he kept asking for more money to do the work, and Mother suspected he was using the money to buy drugs.

4

Mother told the social worker that she wanted to end her relationship with Father.  Mother and the maternal aunt had found an apartment, but it would not be available until August 2022.  Mother told Father that she did not want to continue living in the home with him, but Father refused to move out.

J.B. denied feeling unsafe in the home.  He stated Father was not working which caused more stress in the home because Mother had to work more.  J.B. admitted to smoking marijuana in the past but denied that Father had supplied the drug.

M.B. stated that Father had "hit [him] in the head a lot of times and it makes [him] cry because it hurts," and he cried when he talked about it.  M.B. indicated that when he was in trouble, Father would hit him in the head; he stated that it happened a lot, and he told Mother about it, and she would then speak to Father.  M.B. stated that he was scared of Father "because he's going to hit [him]."

Father acknowledged "slap[ping] [M.B.] to the head or the back of [the] head," but claimed that he had never left any marks or bruises on M.B. and that M.B. did not complain to him about pain.  Father acknowledged that DCFS had previously investigated reports that he physically abused J.B. and that during that previous investigation the social workers had instructed him to not discipline in that manner, but he did not think it was improper.[2]  However, Father agreed to refrain from disciplining the children physically this time.

_____

[2] DCFS had received a prior referral in 2014, in which the reporting party alleged Father engaged in domestic violence against Mother which J.B. sometimes witnessed.  DCFS deemed its investigation inconclusive, because Father and Mother denied

5

At the conclusion of the social worker's visit on June 3, 2022, Mother decided she would leave the family's home to ensure the children's safety. A few days later, Mother notified DCFS that she and the children had moved into an apartment, and she was planning to divorce Father.

## C.  DCFS Obtains a Protective Custody Warrant

On or about June 17, 2022, DCFS applied under section 340, subdivision (b) for a protective custody warrant removing M.B. and A.M. from Father's custody. DCFS sought the warrant based on its claim that M.B. and A.M. were at risk of physical abuse and their physical environment posed a threat to their health or safety. In support, DCFS submitted a declaration from the social worker who had conducted the investigation described above setting forth the facts gathered during that investigation.

The court granted the protective warrant on June 20, 2022, removing M.B. and A.M. from Father's custody and releasing them to Mother.

## D.  Petition and Detention

On June 23, 2022, DCFS filed a section 300 petition on behalf of all three children (J.B., M.B., and A.M.) based on the May 26, 2022 incident in which Father attacked the car while Mother and A.M. were inside it, Father's history of striking M.B. on the head, and Father's substance abuse. DCFS asserted claims under subdivisions (a), (b)(1) and (j) of section 300 based

---

there had been any domestic violence, but J.B. did state that Father disciplined him by hitting him on the head when he made mistakes. A social worker counseled Father and Mother to refrain from using physical discipline.

6

on Father's alleged conduct and Mother's alleged failure to protect the children from Father.

On July 8, 2022, the juvenile court held a detention hearing at which it found a prima facie case that the children were children described under section 300, subdivisions (a), (b)(1) and (j) and vested DCFS with temporary placement and custody. The court found Father to be the presumed father of all three children.[3] It also found it had no reason to know that the children were "Indian children" as defined in the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.).[4] The court ordered the children detained from Father and released to Mother's home. The juvenile court ordered monitored visitation for Father with J.B. at least one hour per week and with M.B. and A.M. a minimum of twice per week for two hours each time; the visits were to be in a neutral setting and Mother was not allowed to be present. The court ordered Father to undergo weekly, random, and on-demand drug and alcohol testing. Mother and Father denied the allegations of the petition.

## E. DCFS Continues Its Investigation

In a jurisdiction/disposition report filed on August 9, 2022, DCFS provided the court information from additional interviews it had conducted. J.B. stated that he was afraid because Father had found out where Mother and the children were living and "will barge in any of these days. I don't know what he'll do."

---

[3] The court found that another individual, who could not be located and is not involved in this appeal, to be the alleged father of J.B.

[4] Father, Mother, and the maternal aunt all denied any known Indian ancestry.

7

However, J.B. indicated that he felt safe during monitored visits with Father.

Mother reported that Father had been sending her more than 50 text messages a day, and some were threatening, erratic, and demeaning towards her. DCFS submitted screenshots of text messages from Father to Mother and to DCFS.[5] Mother also indicated that Father would call her at work repeatedly. Regarding the incident on May 26, Mother stated that she was trying to leave the house with A.M. before Father woke up. However, Father awoke and wanted to spend time with A.M., and became angry when Mother insisted on leaving. Mother also clarified that Father had let the air out of the tires, instead of slashing them.

Mother stated that M.B. had difficulty with reading, and Father would hit him on the back of the head if he said a word incorrectly. Father would hit M.B. on the head with an open hand, and M.B. would cry each time he was hit. Mother denied that Father would hit the children for any other reason.

Father tacitly acknowledged that he made derogatory statements about Mother during his phone calls with the children. Social workers reported that during phone calls with

---

[5] Father's texts included the following: "You f****** stupid b**** who the f*** you think I am[.] Don't take too long because my family is going to be waiting or you just want me to set the house on fire." "[M]orning family of psychopath you haven't let me speak to my boy over the phone and I woke up wanting to f*** with your whole day." "You can pray to God for forgiveness all you want but I'm praying that he punished you and all your f****** family the worst possible way." "B**** child support is the only way you going to put me in jail you f****** b****."

them Father behaved erratically.  During one call, Father claimed the court had not ordered him to undergo drug testing, and the social worker told him that was not correct.

According to Mother, on July 20, 2022, Father had visited the children in a park even though the social worker, who was going to monitor the visit, had cancelled; Mother had already brought the children to the park and allowed Father to go through with the visit.

During a phone call with M.B., Father commented on the dependency case, cursed throughout the conversation, and suggested that M.B. was lying at Mother's request.

Father arrived late to two in-person visits with the children and complained to the children about the social workers and the dependency case, despite the social worker's requests that he stop.  Father told M.B. that the car windshield broke because of his weight, but he was embarrassed so he told the police that he had broken it with his fist.  Father blamed maternal grandmother and Mother for the family's problems.  The social worker cut short one visit after Father complained that Mother was using the children against him and stated, "I was tricked into raising a son that I shouldn't want to raise."

In a last minute information report filed on August 17, 2022, DCFS indicated that it had attempted without success to schedule an interview with Father.  In a further interview, J.B. stated that he had smoked marijuana with Father about five times, beginning around December 2021, and that Father kept marijuana in the garage "in plain sight."

Along with its last minute information, DCFS submitted a copy of the police report regarding the May 26, 2022 incident. According to the report, when the officers arrived they found

Father sitting on the hood of the car with his hands bleeding, and they observed "significant damage" to the front windshield. The officers took Father into custody after Mother made a citizen's arrest. Mother told the officers that Father had deflated the tires but did not puncture them.

DCFS also reported that Father failed to show up for a drug test scheduled for August 11, 2022.

DCFS filed another last minute information report on August 18, 2022, in which it informed the court that Father acknowledged he had seen the children without a monitor on August 14. Mother and J.B. apparently denied this had occurred, but Mother stated that Father had come by her home on August 12 to drop off some things for the children, and she allowed him to speak with M.B. for about five minutes; Mother was scared, in part because she had not told Father where she was living.

## F. Adjudication and Mother's Request for a Restraining Order

At the adjudication hearing on August 18, 2022, Father's counsel urged the court to dismiss the allegations against him. Counsel indicated that Father did not purposefully break the windshield and the windshield broke because it was weak. Counsel further indicated that Father denied that he left marks on M.B., or that M.B. complained about pain after being hit. Finally, counsel argued that there was no "nexus" between Father's alleged drug use and any risk of harm to the children.

The juvenile court sustained the petition under section 300, subdivisions (a), (b)(1), and (j), based on Father's domestic violence against Mother, his physical abuse of M.B., and his substance abuse, and under subdivisions (b)(1) and (j) based on

Mother's failure to protect M.B. and A.M. from Father's substance abuse and her failure to protect all the children from Father's domestic violence against her and from child abuse.[6] The court found that the children were children described in section 300, subdivisions (a), (b) and (j), declared them to be dependents of the court, and placed them in Mother's home under DCFS supervision.

With respect to disposition, the children's counsel requested Father's case plan include a domestic violence program and that his visits occur at a DCFS office. DCFS also requested that Father's visits occur at a DCFS office. Father objected to participating in a domestic violence program and requested individual counseling instead. Father also requested that his visits occur somewhere other than a DCFS office; if the visits were at a DCFS office, Father requested that DCFS pay for parking.

The court found by clear and convincing evidence that it was reasonable and necessary to remove the children from Father's custody, it would be detrimental to the children to return them to Father, and DCFS had made reasonable efforts to prevent removal. The court ordered monitored visitation for Father at a neutral location "starting at [the] DCFS office or visitation center," to take place at least two hours twice per week,

---

[6] As requested by DCFS, the court amended the petition to delete the reference to Mother being a culpable party in the count under section 300, subdivision (a) regarding Father's physical abuse of M.B. However, the court sustained the count under subdivision (b)(1) based on Mother's failure to protect the children from Father's child abuse.

11

with DCFS to pay for parking if the visits were at the DCFS office.

The court also ordered enhancement services for Father, including a drug program, on-demand drug testing, parenting classes, anger management classes if recommended by a therapist, a domestic violence program, and individual counseling to address case issues such as parenting.

Finally, Mother requested the court grant a temporary restraining order (TRO) protecting her and the children from Father. Counsel for the children and DCFS also urged the court to issue the TRO. Father objected to the TRO and requested a stay-away order instead and asked that the children be left out of the order. The juvenile court granted the TRO protecting both Mother and the children, with the TRO permitting Father to have monitored visitation with the children at least two hours twice a week. The court set a hearing on Mother's application for a permanent restraining order[7] for September 12, 2022.

## G. Post-disposition Proceedings

On September 8, 2022, Father filed a section 388 petition in propria persona requesting the court change its restraining order and monitored visitation order. Father claimed he was being "detached" from his children which was "devastating for [J.B.]," and the events had "been life changing for our family." He

_____

[7] A juvenile court is authorized to issue a temporary restraining order without notice (§ 213.5, subds. (a) & (c)(1)) and to issue a restraining order with a duration of up to three years after notice and a hearing (*id*., subd. (d)). To distinguish these two types of restraining orders, we refer to a restraining order issued after notice and a hearing as a "permanent" restraining order.

12

requested that the court dismiss the case and make his completion of the various programs it had ordered voluntary instead.

The juvenile court denied Father's section 388 petition on September 12, 2022, finding there was no new evidence, the proposed change of order was not in the children's best interests, and Father had counsel.

That day, the court also held a hearing on Mother's request for a permanent restraining order and granted the request, issuing an order protecting Mother and the children from Father until September 10, 2025. As with the TRO, the court allowed an exception for monitored visitation by Father.

On September 12, 2022, Father filed a timely appeal of the juvenile court's August 18, 2022 orders.

## H.    Post-appeal Events

On February 7, 2023, the juvenile court terminated jurisdiction as to J.B. as he had turned 18; he remained released to Mother. On the same day, the juvenile court terminated jurisdiction as to M.B. and A.M. given that the conditions which justified the initial assumption of jurisdiction no longer existed and were not likely to exist if supervision was withdrawn. The juvenile court issued a custody order granting sole legal and physical custody to Mother and monitored visits to Father.[8]

---

[8] No party argues the juvenile court's subsequent termination of jurisdiction renders this appeal moot. DCFS does, however, contend that Father's challenge to dependency jurisdiction is not justiciable because Mother did not contest the allegation that she had failed to protect the children from Father's substance abuse. We address the merits of Father's

13

## DISCUSSION

### A.  Standard of Review for Jurisdictional and Dispositional Orders

We review a juvenile court's jurisdictional and dispositional findings for substantial evidence.  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  Under this standard, " 'we determine if substantial evidence, contradicted or uncontradicted, supports [the findings].  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' "  (*Ibid*.)  We will affirm a judgment if it is supported by substantial evidence "even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence."  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)  "However, '[s]ubstantial evidence is not synonymous with any evidence.  [Citation.]  To be substantial, the evidence must be of ponderable legal significance and must be

---

appeal because even if the issues presented are moot given Mother's concession and/or the termination of jurisdiction, the issues raised by Father may have impacted the court's exit order denying Father custody and providing him only monitored visitation.  (*In re D.P.* (2023) 14 Cal.5th 266, 285-288.)  Father has filed a separate appeal of the exit order, which is pending.  (*Los Angeles County Department of Children and Family Services v. Jose R.*, B326915.)

14

reasonable in nature, credible, and of solid value.' [Citations.]" (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602.)

Given that the dispositional finding must be supported by clear and convincing evidence, "when there is a substantial evidence challenge, the reviewing court must determine whether the record contains substantial evidence from which a reasonable trier of fact could find the existence of that fact to be highly probable." (*In re V.L.* (2020) 54 Cal.App.5th 147, 149; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996 ["when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true"].)

Finally, Father challenges the juvenile court's order requiring him to participate in a domestic violence program and its order regarding monitored visitation. We review both orders for abuse of discretion. (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311; *In re D.P.* (2020) 44 Cal.App.5th 1058, 1070.)

## B. Substantial Evidence Supported the Juvenile Court's Assertion of Jurisdiction

### 1. *Applicable Law*

At the jurisdictional stage, the juvenile court must determine by a preponderance of the evidence if a child is described by section 300. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) The juvenile court here asserted jurisdiction under subdivisions (a), (b)(1), and (j) of section 300.

Subdivision (a) of section 300 authorizes juvenile court jurisdiction in situations where "[t]he child has suffered, or there

15

is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (*Ibid.*) " 'Nonaccidental' generally means a parent or guardian 'acted intentionally or willfully.' " (*In re Cole L.*, *supra*, 70 Cal.App.5th at p. 601, quoting *In re R.T.* (2017) 3 Cal.5th 622, 629.)

As relevant here, subdivision (b)(1) of section 300 authorizes dependency jurisdiction where, "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:  [¶]  (A) The failure or inability of the child's parent . . . to adequately supervise or protect the child.  [¶]  (B) The willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left.  [¶]  . . .  [¶]  (D) The inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (*Id.*, subd. (b)(1)(A), (B) & (D).)[9]

A child is subject to the juvenile court's jurisdiction under subdivision (j) of section 300 if "[t]he child's sibling has been abused or neglected, as defined in [other subdivisions of the section], and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. . . ." (*Ibid.*)

---

[9] Section 300 was amended effective January 1, 2023. (Stats. 2022, ch. 832, § 1.)  The amendments are immaterial to the issues presented in this case, and we will refer to the current version of the statute.  Current subdivisions (b)(1)(A)-(D) were formerly set forth in subdivision (b)(1) without separate designation.

16

Where, as here, a section 300 petition alleges multiple grounds for jurisdiction, we can affirm the juvenile court's assertion of jurisdiction if substantial evidence supports any of the alleged grounds for jurisdiction. (*In re D.P.*, *supra*, 14 Cal.5th at p. 283.) As we explain below, substantial evidence supports the juvenile court's assertion of jurisdiction under subdivision (a) of section 300, based on Father's domestic violence against Mother, and Father's physical abuse of M.B. Father's domestic violence, along with his substance abuse, also supports the court's assertion of jurisdiction under subdivision (b)(1)(A) of section 300. We accordingly need not, and do not, address the assertion of jurisdiction under subdivision (j) of section 300. (*In re D.P.*, *supra*, at p. 285.)

2.    *Substantial Evidence Supported the Assertion of Jurisdiction under Section 300, Subdivision (a)*

a.    <u>The May 26, 2022 Incident</u>

An incident of domestic violence can support a finding that a child is in danger of being injured "nonaccidentally" within the meaning of subdivision (a) of section 300 where, as here, the child was present and was at risk of physical injury. (*In re Nathan E.* (2021) 61 Cal.App.5th 114, 121-122; *In re M.M.* (2015) 240 Cal.App.4th 703, 720-721.)

The evidence shows that, on May 26, 2022, Father reacted angrily when he found out that Mother was going to leave the house with A.M.; Mother then locked herself and A.M. in the car, and Father responded by deflating the car's tires, climbing onto the hood of the car, smashing the windshield, and prying it open with his hands. There was substantial evidence that Father smashed the windshield intentionally and not accidentally, and

17

his shattering of the glass placed A.M., who was inside the car throughout this entire incident, at risk of serious injury.

Father argues the May 2022 incident "was isolated and unlikely to recur." In support, he points out that there was no evidence he threatened Mother prior to the May 2022 incident. He also notes that Mother ended her relationship with him and moved to a separate residence with the children by the time of the jurisdiction hearing.

These arguments do not persuade us that the juvenile court erred. "Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citations.] The court may consider past events in deciding whether a child presently needs the court's protection. [Citations.] A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' [Citations.]" (*In re Cole L.*, *supra*, 70 Cal.App.5th at pp. 601-602.) That is the situation here.

There is substantial evidence that the May 2022 incident was caused by factors which continued to exist at the time of the jurisdiction hearing. Specifically, there was evidence that Father's substance abuse triggered the incident, both in terms of causing the parents' strife and Father's extreme behavior during the incident, and that Father continued to abuse drugs after the dependency case was filed. Father refused to acknowledge the severity of the incident, and instead maintained his dubious claim that the windshield broke under his weight, not because he tried to break it. "A parent's denial of domestic violence increases the risk of it recurring. [Citations.]" (*In re V.L.*, *supra*, 54

18

Cal.App.5th at p. 156; see also *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].) Finally, after the parties separated and during the dependency case, Father continued to engage in domestic violence by harassing Mother with threatening and demeaning texts and calls to her workplace.

> b. Father's Physical Abuse of M.B.

Father admitted to "slap[ping] [M.B.] to the head or the back of [the] head." M.B. stated that Father had "hit [him] in the head a lot of times and it makes [him] cry because it hurts," and that he was scared of Father "because he's going to hit [him]." Mother reported that M.B. had difficulty with reading, and Father would hit him on the back of the head until he said a word correctly; Father would hit M.B. on the head with an open hand, and M.B. would cry each time he was hit.

Such repeated abuse subjected M.B. to a risk of "serious physical harm inflicted nonaccidentally" by Father. (§ 300, subd. (a).) Section 300, subdivision (a) provides that "a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." Here, there was evidence of an ongoing pattern of physical abuse by Father against M.B. Father claims that his strikes did not leave marks, but he does admit that he hit M.B. in the head. Repeatedly hitting a child in the head can lead to injuries without leaving any marks. Furthermore, the juvenile court could reasonably infer from Father's other behavior,

including the incident where he broke the windshield, that his abuse of M.B. could have escalated.

Father points out that he agreed to restrain from physically disciplining the children in the future. However, the juvenile court could have reasonably concluded that Father was not credible in this regard. Father acknowledged that DCFS had previously investigated reports that he struck J.B. in the head as discipline, and that social workers had instructed him to not discipline in that manner. Despite this, he did the same thing to M.B., and when questioned about his conduct he told social workers he did not think his use of force against the children was improper.

Father argues his case is like *In re D.M.* (2015) 242 Cal.App.4th 634, 637, where "[the] mother used her hand or a sandal to spank her two children on the buttocks on those 'rare' occasions when lesser disciplinary measures proved ineffective, but never hard enough to leave bruises or marks," and the Court of Appeal concluded that the juvenile court improperly asserted jurisdiction under subdivision (a) of section 300 "without first examining whether [the mother's] conduct falls outside the right of parents, which exists elsewhere in California civil and criminal law, to discipline their children as long as the discipline is genuinely disciplinary, is warranted by the circumstances, and is reasonable (rather than excessive) in severity." (*In re D.M.*, *supra*, at p. 637.)

*In re D.M.* does not apply here for two basic reasons. First, the holding of that case was based, in part, on the Legislature's decision to treat spanking differently from other types of physical discipline. (*In re D.M.*, *supra*, 242 Cal.App.4th at p. 640.) Thus, subdivision (a) of section 300 provides that " 'serious physical

harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury." Here, Father hit M.B. on the head, not the buttocks. Father does not identify any case in which a court has concluded repeatedly hitting a child in the head can constitute proper discipline.

Second, there is substantial evidence that Father's blows to M.B.'s head were not warranted by the circumstances or genuinely disciplinary. Father did not physically discipline M.B. for misbehavior after lesser discipline proved ineffective; he repeatedly hit M.B. on the head when the child (who had difficulty reading) failed to pronounce words correctly.

   3.   *Substantial Evidence Supported Assertion of Jurisdiction under Section 300, Subdivision (b)(1)(A)*

   a.   Father's Substance Abuse

Contrary to Father's claim, there is substantial evidence that, due to his substance abuse, Father was unable "to adequately supervise or protect the child[ren]" and thus the juvenile court properly found it had jurisdiction under subdivision (b)(1)(A) of section 300.

Father admitted to using methamphetamine for about six months, and to more recently using crack cocaine and drinking alcohol to excess. The juvenile court could reasonably infer that Father's abuse of these substances led to his violent conduct on May 26, 2022. The court could also reasonably infer that Father's substance abuse caused him to stay in the garage for long periods of time and engage in behavior that frightened the other family members. Mother, the maternal aunt, and maternal grandmother all stated that they and the children stayed out of the house for as long as they could due to Father's behavior.

21

Furthermore, the court could reasonably conclude that Father's substance abuse continued unabated, and that he was either unwilling or unable to stop.  Father refused to undergo drug testing, and then incorrectly told a social worker that the court had not ordered him to submit to testing.  Father was finally scheduled to take a drug test a week before the adjudication hearing, but he failed to show up.[10]

Father relies on *In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763, disapproved on another ground in *In re D.P., supra,* 14 Cal.5th at p. 283, but that case is distinguishable.  The father in *In re Drake M.* used "medical marijuana."  (*Id.* at pp. 760, 769.) The court concluded there was insufficient evidence to establish jurisdiction under former subdivision (b)(1) of section 300 (current subdivision (b)(1)(A)) because there was no evidence the father's use of marijuana created any risk that the child would be harmed.  (*In re Drake M., supra,* at p. 769; see also *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003 [jurisdiction improper where there was no evidence "that [the child] was at risk of suffering physical harm as the result of [the m]other's use of illegal drugs"].)  Here, in contrast, there was substantial evidence that

---

[10] Father contends in his brief that he "agreed to voluntarily participate in a drug recovery program."  However, what the record discloses is only that Father told a social worker that he was willing to participate in such a program; the record does not disclose any evidence that Father took any steps to enroll in such a program or take any other steps to address his substance abuse prior to the adjudication hearing.

Father's substance abuse resulted in him being violent towards Mother and A.M., among other problematic behaviors.[11]

b.    Father's Domestic Violence

The threat of a child being injured accidentally through domestic violence can support jurisdiction based on a parent's failure "to adequately supervise or protect the child" within the meaning of subdivision (b)(1)(A) of section 300.  (*In re T.V.* (2013) 217 Cal.App.4th 126, 135; *In re Heather A.* (1996) 52 Cal.App.4th 183, 194.)  The substantial evidence here that Father perpetrated domestic violence against Mother and A.M. on May 26, 2022, and that there was a significant risk of future domestic violence,

_____

**11** Father cites to another portion of the *In re Drake M.* opinion in which the court addressed jurisdiction under what is now subdivision (b)(1)(D) of section 300.  (*In re Drake M.*, *supra*, 211 Cal.App.4th at pp. 764-768.)  That subdivision applies when a parent or guardian is unable "to provide regular care for the child due to the parent's . . . substance abuse."  (§ 300, subd. (b)(1)(D).)  Although DCFS also asserted this ground for jurisdiction in this case, we do not address it given our conclusion that jurisdiction is supported under subdivision (b)(1)(A) of section 300.  Thus, we do not address the court's holding in *In re Drake M.* that to prove "substance abuse" under section 300, subdivision (b)(1)(D) requires either a medical diagnosis of substance abuse or evidence of symptoms that meet a clinical definition of substance abuse.  (See *In re Drake M.*, *supra*, 211 Cal.App.4th at p. 766.)  However, we note that other courts have declined to adopt this approach.  (See *In re K.B.* (2021) 59 Cal.App.5th 593, 601 [a juvenile court can find a parent abused substances without a medical diagnosis or evidence that the parent met the clinical definition of substance abuse]; *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 725-726 [same]; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1218 [same].)

supported dependency jurisdiction under subdivision (b)(1)(A) of section 300.  As discussed above, Father's arguments that there was no substantial evidence that his domestic violence put the children at risk of harm lack merit.

## C. Father's Challenge to the Juvenile Court's Removal Order Fails

Father challenges the juvenile court's order removing the children from his custody.  We conclude that substantial evidence supports the removal order.

### 1. *The Applicable Law*

To remove a child from parental custody, the juvenile court must find by clear and convincing evidence that specified circumstances are present justifying such a disposition.  (§ 361, subds. (c)(1) & (d).)  Father was living with the children when DCFS filed the petition, and therefore subdivision (c) of section 361 applies.  Under subdivision (c)(1) of section 361, removal from a parent is authorized when "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  The statute lists two specific alternatives which the juvenile court "shall consider" before removing a child from a parent's custody: "(A) The option of removing an offending parent . . . from the home.  [¶]  (B) Allowing a nonoffending parent, guardian, or Indian custodian to retain physical custody as long as that parent, guardian, or Indian custodian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm."  (*Id.*, subd. (c)(1)(A) & (B).)

24

"Actual harm to a child is not necessary before a child can be removed."  (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 154.)  This is because the focus of the statute is on averting harm to the child.  (*In re D.B.* (2018) 26 Cal.App.5th 320, 328; *In re T.V.*, *supra*, 217 Cal.App.4th at pp. 135-136.)  In determining whether a child may be safely maintained in the parent's physical custody, "the [juvenile] court may consider the parent's past conduct as well as present circumstances."  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

2.      *The Juvenile Court's Removal Order Was Proper*

Father only challenges the juvenile court's removal order by arguing, "Instead of removing the minors from . . . [F]ather, the juvenile court should have offered him services to assist him in caring for the minors, such as preservation services, family therapy, or wraparound services.  In particular, . . . [F]ather needed drug treatment and housing assistance."

Father has forfeited this argument because he never proposed these steps to the juvenile court.  Instead, Father only objected to being ordered to participate in a domestic violence program, and requested that visitation not be required to take place at a DCFS office or he receive assistance paying for his parking at the DCFS office.  Parties, including parents in dependency cases, are not permitted to raise issues for the first time on appeal that could have been raised in the trial court.  "[A]ny other rule would permit a party to trifle with the courts" by "deliberately stand[ing] by" without making an objection, and "thereby permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable."  (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338, 1339 ["Many dependency cases have held that a parent's failure to object or

25

raise certain issues in the juvenile court prevents the parent from presenting the issue to the appellate court"].)  It is unfair to the trial court and the other parties for an appellate court to consider a defect that could have been presented to the trial court and cured.  (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 603.)

Even if we were to conclude that Father had not forfeited his challenge to the removal order, we find no merit in his argument.  Father consistently failed to acknowledge the severity of his conduct, repeatedly violated the juvenile court's visitation orders, and continued to abuse drugs.  Under these circumstances, we agree with Mother that it would have been "unrealistic to think" services could have ameliorated Father's conduct sufficiently to make it safe for the children to be released to his custody.

## D.   The Juvenile Court Did Not Abuse Its Discretion in Ordering Father to Participate in a Domestic Violence Program

Father challenges the juvenile court's order requiring him to participate in a domestic violence program.  We conclude that the court did not abuse its discretion in making the order.

A juvenile court may make "all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a).)  Section 362, subdivision (d) specifically authorizes a juvenile court to "direct any reasonable orders to the parents" of a dependent child "includ[ing] a direction to participate in a counseling or education program," provided that the "program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by [s]ection 300." (*Ibid.*)  " 'The juvenile court has

26

broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly.' " (*In re Briana V.*, *supra*, 236 Cal.App.4th at p. 311, quoting *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.)

Father argues that he did not need to participate in a domestic violence program because the May 26, 2022 incident was "isolated, unlikely to recur, and was the result of increasing financial stress in the family." However, as is discussed above, there was substantial evidence that the factors which led to the incident, which included Father's substance abuse and the parents' substantial disagreements, were still present at the time the court made its disposition orders. In addition, during the dependency proceedings Father continued to exhibit abusive behavior towards Mother, including through harassing texts and phone calls.

## E. The Juvenile Court Did Not Abuse Its Discretion in Ordering Monitored Visitation

Father contends the juvenile court abused its discretion in restricting him to monitored visitation with the children, arguing that the restriction was not in the best interests of the children. Father's contention is meritless.

"The power to regulate visits between dependent children and their parents rests with the juvenile court . . . ." (*In re D.P.*, *supra*, 44 Cal.App.5th at p. 1070.) When making an order for visitation, the juvenile court must "balanc[e] . . . the interests of the parent in visitation with the best interests of the child," and may "impose . . . conditions . . . in light of the particular circumstances of the case before it." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.)

27

The juvenile court did not abuse its discretion in ordering monitored visitation given that Father admitted to using methamphetamine and cocaine, along with excessive amounts of alcohol, and there was substantial evidence that Father was continuing to use these substances. Furthermore, there was evidence that Father was unable to control his anger and acted violently. Monitored visitation was also appropriate given that J.B. and M.B. both admitted to being afraid of Father. Finally, having a monitor present was justified given that Father repeatedly transgressed the court's orders with respect to visitation, behaved erratically during visits, complained directly to the children about the dependency case, and badmouthed Mother including telling the children she "tricked [him] into raising" one of them.

## F. Father's Notice of Appeal Does Not Encompass the Permanent Restraining Order

Father lastly challenges the permanent restraining order issued by the juvenile court on September 12, 2022. Mother contends that we lack jurisdiction to review the restraining order because Father's notice of appeal does not mention the juvenile court's issuance of that order nor purport to appeal from any order issued on September 12, 2022. We agree.

While we must liberally construe a notice of appeal (*In re Joshua S.* (2007) 41 Cal.4th 261, 272; Cal. Rules of Court, rule 8.405(a)(3)), " 'The policy of liberally construing a notice of appeal in favor of its sufficiency [citation] does not apply if the notice is so specific it cannot be read as reaching a judgment or order not mentioned at all.' [Citations.]" (*In re J.F.* (2019) 39 Cal.App.5th 70, 76.) Father's notice of appeal does reference specific dates and orders, but it does not reference the date of the restraining

28

order hearing or the restraining order. In addition, Father did not designate the reporter's transcript for the September 12, 2022 proceeding where the permanent restraining order hearing was held and that order issued. Under these circumstances, his notice of appeal cannot be read to include the court's permanent restraining order issued on September 12, 2022.[12]

Furthermore, even if we were to construe the notice of appeal to include the restraining order, we would still have to dismiss that portion of Father's appeal because we lack an adequate record, including the transcript of the hearing at which the court issued the restraining order. An appellant's " '[f]ailure to provide an adequate record on an issue requires that the issue be resolved against [the appellant].' [Citation.]" (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) Accordingly, we dismiss Father's purported appeal from the restraining order issued on September 12, 2022.

---

[12] To the extent Father purports to appeal from the juvenile court's issuance of the TRO, which was issued on August 18, the appeal would be moot given that the TRO was only effective until September 12, and the court later issued the permanent restraining order.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed. We dismiss Father's purported appeal of the restraining order issued by the juvenile court on September 12, 2022.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.